Nevel A. WALTERS, Plaintiff,

v.

INEXCO OIL COMPANY, Defendant and
Third Party Plaintiff,

v.

LOFFLAND BROTHERS COMPANY,
Third Party Defendant.

Mrs. Delphia WALTERS, Plaintiff,

v.

INEXCO OIL COMPANY, Defendant and
Third Party Plaintiff,

v.

LOFFLAND BROTHERS COMPANY,
Third Party Defendant.

Civ. A. Nos. H77–0021(N), H77–0022(N).

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

April 26, 1979.

Leonard B. Melvin, Jr. and Sarah Entrekin, Laurel, Miss., for plaintiffs.

M. M. Roberts, Roberts & Easterling, Bruce C. Aultman, Aultman & Aultman, Hattiesburg, Miss., for defendants and third party plaintiff.

## MEMORANDUM OPINION

WALTER L. NIXON, Jr., District Judge.

These consolidated diversity actions were filed by the plaintiffs, Nevel A. Walters and his wife, Mrs. Delphia Walters, both resident citizens of the State of Mississippi, against Inexco Oil Company, a foreign corporation, to recover damages for personal injuries sustained by Mr. Walters as a result of an explosion which occurred in the course of his employment with Loffland Brothers Company while drilling an oil well for Inexco Oil Company. The Complaint of Mrs. Delphia Walters seeks to recover for loss of consortium caused by the personal injuries suffered by her husband as a result of the explosion. The plaintiffs charge that Inexco is liable to them because of its negligence in failing to furnish Walters a safe place to work and in failing to properly install, test and inspect the "kill" line, a safety device which is attached to the well to control well explosions caused by subterranean pressure. Inexco has filed a general denial of the allegations of the Complaint and has filed a Third Party Complaint against Loffland Brothers Company alleging that under the Master Rotary Drilling Contract executed by Inexco and Loffland, Loffland has agreed to be responsible for all liability incurred in the course of the drilling operation, and to stand between Inexco and any loss and that any negligent actions complained of were those of Loffland Brothers.

The case was tried before the Court without a jury, and based upon all the evidence of record, the pretrial order, pleadings and proposed findings of fact and conclusions of law and memoranda of authority submitted by the parties, this Court makes the following findings of fact and reaches the following conclusions of law.

### Findings of Fact

At the outset the Court notes that this trial revolved around the business relationships and terminology which are indigenous to the oil production industry, and an explanation and description will be helpful. The person or business that actually drills the oil well is called the contractor, and his responsibility, subject to the terms of the contract he enters into and government regulations, as will be revealed below, is to drill the well to the depth specified in the contract and hopefully at that point to bring the well into a producing status. The person or organization who owns or has control of the mineral rights sought to be exploited by the well is called the operator, and again subject to the contract terms and government regulations, the operator has certain obligations to fulfill in drilling the well, most notably insofar as this case is concerned, the duty to require that safety precautions be taken on the job site. In this case the operator was the defendant Inexco Oil Company, and Inexco had signed a contract with Loffland, the contractor, under which Loffland would drill the well in question for Inexco.

The crew which actually handles the drilling rig, in this case all Loffland employees, is made up of six men. The man in charge is called the tool pusher, and on the day of the accident the regular tool pusher, named Riley Dials, was not present at the job site and a substitute tool pusher, Bobby J. Fielder, was in charge. The man immediately subordinate to the tool pusher is called the driller, who on this job was Clyde Denson. He was in immediate control of the four roughnecks or manual laborers on the drilling operation. In addition to the plaintiff Walters, the other roughnecks were Joe Roberts, Thomas J. Smith, and a man who was identified only as Frenchie.

On February 26, 1971, Walters was working as a roughneck for Loffland Brothers on a drilling rig owned by Loffland and engaged in drilling a well on an Inexco lease at Masonite Well No. 2 in the Prairie Branch Field in Clarke County, Mississippi. It was raining on the day in question and Walters was putting on his rain slicker in the early morning when he saw a man whom the crew had come to identify as a representative of Inexco (referred to by the witness as "the Inexco man") talking to Bobby Fielder, the tool pusher on that day.

24

Walters was close enough to the Inexco man and Fielder to hear the Inexco man tell Fielder to have the crew hook up the kill line, which, as will be discussed in detail below, is a safety device designed to aid in controlling the danger of explosion caused by subterranean pressure exerted by oil and gas seeking escape to the surface. After the Inexco man told Fielder to have the kill line connected, the driller, Clyde Denson, came to Walters and Thomas J. Smith and told them to attach the kill line.

When the drilling of an oil well is started after the rig is set up, one of the first steps is to drill a hole and insert a large pipe called the surface casing to protect the sides of the hole from caving in, to prevent fresh water and sand seepage, allow the operator to build up mud weight, and to allow drilling to the desired depth. The size of the surface casing, and the depth to which it will extend are controlled by the agreement between the contractor and the operator, which is embodied in the "Bid Sheet and Drilling Order." In this well a surface casing of 10¾ inches diameter was called for, to extend to a depth of approximately 3500 feet. After the surface casing has been installed, concrete is pumped under pressure into the surface casing and is under such pressure that it then comes back up on the outside of the surface casing, between the large pipe and the ground, until the concrete reaches the surface. The concrete is then allowed to set or harden for a period of time determined by the operator in order that the surface casing might be secured in the hole to allow further drilling to proceed. The well head is welded to the top of the surface casing, and safety devices called blow-out preventers are attached to the top of the well head. Since more than one of these can be used, it is common to refer to the blow-out preventer "stack." This well had two blow-out preventers, a high and a low blow-out preventer, with the former located approximately 40" above the ground. Of course all the well head/blow-out preventer stack are below the drilling platform floor, which is located several feet above the blow-out preventers. Between the two blow-out preventers there is a valve

to which the "kill line" is to be attached. Through the kill line, when attached to the blow-out preventer assembly, can be pumped drilling fluid, commonly mud, from there down into the hole to subdue well pressure caused by oil and gas. The connection to which the kill line is attached is the stand pipe.

Pursuant to Denson's instructions, Smith and Walters went under the rig floor to connect the kill line, and according to Smith, Walters was fitting a Stilson wrench to the valve when the valve blew out of the stand pipe, the force of the explosion hurling the plaintiff out from under the rig substructure and into the drilling line spool. The drilling mud which spewed out as a result of the explosion almost drowned the plaintiff, and he was severely and permanently injured. Walters did nothing to precipitate this explosion in any manner. As quickly as possible, the plaintiff was placed in the back seat of a car and Fielder and Smith drove him 20 miles to the Jones County Community Hospital for emergency treatment.

There was a factual dispute at the trial over whether a representative from Inexco had been to the well site on the day of the accident and talked to the tool pusher. As noted above, Walters testified that he had seen the "Inexco man" at the well site several times prior to the accident, as well as on the day of the accident, and was able to identify this person as an Inexco employee by the fact that he drove a car with an Inexco emblem on its door. Walters did not know this man's name, but described him as short and heavy set, and noted that he never wore a safety hat. Walters said he had seen the Inexco man at the well site at least four times, and as noted above, it was this man who told the tool pusher to have the kill line connected.

Joe Roberts, another of the roughnecks on the crew, said he had seen the Inexco man at another well site driving a car with an Inexco emblem on the side, and had seen this Inexco man three or four different times walking around the well site where the accident occurred. Roberts stated that

the Inexco man had been at the well site on the day of the accident, that it was the same Inexco man he had seen at the other well site, and that on the day in question this man talked to the tool pusher, though Roberts did not hear what was said. Roberts did hear the driller tell Smith and Walters to connect the kill line, as they were all standing on the floor of the drilling line at the time.

Smith testified that the Inexco man had come out to the well site three or four times in the company car with the Inexco emblem on the side, but that he had never heard the man's name. Smith saw the Inexco man at the well site on the day of the accident talking to the tool pusher, but did not hear any of the conversation.

On the other hand Bobby Fielder, the tool pusher on the day in question, stated in his deposition that no representative from Inexco had been at the well site on the day of the accident, but since this had been Fielder's first day as the tool pusher on this rig, there was no way Fielder could say whether or not the Inexco man had been there on previous occasions in a company car. The representatives of Inexco stated that when the well was being drilled on a footage basis, as it was at the time of the accident, Inexco would not have any supervisory personnel on the job site, and if there were such people those people would not have any right to direct Loffland's conduct of the drilling operation. In addition, the regular tool pusher, Milton Riley Dial, testified that he had never seen any Inexco personnel at the site in company cars, and the Inexco representative testified that there were no such company cars in the area at this time.

This Court acknowledges that it is difficult to ascertain precisely what occurred when faced with such conflicting testimony. However, the Court having heard and considered the testimony of the various witnesses and observed their demeanor while testifying, and having considered the depositions offered into evidence, is of the opinion that the testimony of Walters, Smith and Roberts presented the more accurate account of the events which transpired in relation to the presence of the Inexco man at the well site. Therefore we find as a fact that the Inexco man had been in the area in a company car with the Inexco emblem on the side prior to the accident, that he was at the well site on the day of the accident, and that Walters and Smith undertook to connect the kill line because he had directed the tool pusher to have this done.

The agreement between Inexco and Loffland for Loffland to drill this well is reflected by the Master Rotary Drilling Contract executed by these parties (Exhibit P–3), and the Bid Sheet and Drilling Order (Exhibit P–6). This latter document is a proposal by Inexco to Loffland, which was accepted by Loffland, embodying the manner in which Inexco wishes Loffland to drill the well, and it contains a number of technical requirements that each party must meet and supplements the Master Rotary Drilling Contract in setting out the parties' rights and responsibilities.

The relationship of these two documents was examined by the expert witness for the plaintiff, Paul Montgomery, a petroleum engineer who had supervised the drilling and completion of over 200 oil wells and was extremely knowledgeable in the area of oil well drilling contracts and procedures. Under these agreements Loffland was to furnish the drilling rig, the crew to man the drilling rig, certain equipment, handle all maintenance of the rig, and drill the well to a specified depth. The operator, Inexco, was obligated to furnish certain materials, the location for the rig, the drilling mud, chemicals and additives, the surface casing and cement, and the well head. In addition, the operator was also obligated to obtain all the permits from the Mississippi State Oil and Gas Board. The depth of the surface casing and size of the pipe to be used were to be designated by the operator, who did so, as reflected in its application for a permit to drill filed with the Mississippi State Oil and Gas Board. Inexco also had the right to and did determine the amount of cement to be used in setting the surface

casing, and how long this cement should be allowed to set.

Once the surface casing had been cemented in place, the operator, as noted above, was responsible for providing a well head, although the contractor performed the actual labor of welding the well head in place. At that point the blow-out preventers were installed, as they have flanged edges which mate the flange on the upper part of the well head. The specifications for this well called for 10 inch blow-out preventers, Series 900, to be tested when installed to 2000 psi working pressure.

The operator, in this case Inexco, who obtained the permits from the Mississippi Oil and Gas Board was responsible for installing and testing the blow-out preventers, although again it was the roughnecks who worked for Loffland who were to perform the actual physical labor. Likewise, the operator was responsible for testing the surface casing to insure that there were no leaks and that the blow-out preventers were properly installed. The operator is also required to set and supervise the mud program, a procedure which will be explained further, and to supply the mud, the chemicals and other additives therefor. The operator was to determine the type of record keeping to be maintained of the well's progress, and to determine when the well reached the desired depth. The operator generally has knowledgeable engineers and geologists available to make these decisions.

Most importantly, as far as this action is concerned, the custom and practice in the oil industry is for the operator to have the responsibility for setting up the blow-out preventer system, including the installation of the kill line prior to commencement of drilling, since that is an integral part of the blow-out prevention system. It is then the operator's responsibility to perform and supervise the testing of the blow-out preventers, the kill line and the other safety devices, which are all attached to the surface casing and well head. Only after the operator is satisfied that the blow-out preventers, kill line and related safety equipment have been tested to the desired pressure, also determined by the operator, does the operator then give the contractor permission to drill through the cement which has plugged the bottom of the surface casing.

In light of these facts, reinforced by Mr. Montgomery's experience and testimony, and the testimony of the roughnecks— all of whom were experienced oil field hands—as well as in accordance with the terms and conditions of the drilling contracts, this Court finds that Inexco had the responsibility of installing, testing and inspecting the blow-out preventers and related safety equipment, including the kill line. Inexco had the responsibility of testing these blow-out preventers, including the kill line, to the designated pressure of 2000 psi at the time the blow-out preventers were installed, and this should have been done before Inexco authorized Loffland to drill through the cement plug and out of the surface casing, which was the only safe time to perform this testing. The Court finds that only by performing these duties could Inexco be certain it was turning over to the Loffland crew a safe place to work. This duty on Inexco's part is further established by Rule 13 of the Oil and Gas Regulations which states that in high pressure areas, such as the one in question, "all proper and necessary precautions shall be taken for keeping the well under control, including the use of blow-out preventers and high pressure fittings attached to properly anchored and cemented casing strings." Since Inexco applied for and was granted a permit for drilling the subject well (Exhibit P-17), it thereby agreed to abide by the rules and regulations of the Oil and Gas Board. Section 15 of the Master Rotary Drilling Contract also obligates both Inexco and Loffland to comply with all laws, rules and regulations whether federal, state or municipal, which might apply to the drilling operation.

The kill line is part of the drilling rig and thus belonged to Loffland, and is carried from drilling project to drilling project in a compartment under the rig floor. As stated above, the operator is responsible for

seeing that the kill line is attached to the blow-out preventers prior to drilling out of the surface casing, and the key issue before the Court is why this was not done, or if it was done, as claimed by Inexco, why the line was not attached on the day of the accident. Roberts was present when the surface casing was set and the blow-out preventers tested, but he said the kill line was not tested, and Smith did not know whether the kill line had been tested. However all of the witnesses with oil field experience agreed that hooking up and testing the kill line was a very important safety measure. No representative of the operator was present when whatever testing of the safety devices was actually performed, although a representative of Inexco was there when the surface casing was set and cemented.

The regular tool pusher on the job, Riley Dial, was present when whatever testing was done was performed prior to the commencement of drilling and he stated that the kill line was attached and tested at the time the blow-out preventers were installed. According to Dial, the blow-out preventer was subsequently disconnected from the well-head because the kill line became plugged up. Dial said he meant to clean it out and put it back on the blow-out preventer, but never did so. However the Court declines to accept this explanation of the events leading up to explosion, and finds that the kill line was never hooked up prior to the explosion. This same witness said that there had been no experience with kicking at this well and that the area was a low pressure area, although every other witness testified that this was a high pressure area, and the roughnecks all stated that the well had been kicking for some time previous to the explosion, requiring large quantities of drilling mud to control it. This is confirmed by the reports of the mud program. However, there is no indication in any of the logs maintained of the drilling operation of the removal of the kill line, nor did any of the roughnecks who testified have any knowledge of this occurrence. When Walters and Smith went under the rig floor to attach the kill line on the day of the accident, they found the line coiled up in the bracket or rack used to carry the kill line from one drilling site to another. No witness testified that he had seen the kill line attached, and no roughneck testified that he had participated in the hooking up of the kill line at the beginning of the drilling. It is highly significant that the party charged with making sure that this kill line was attached and tested, Inexco, could offer no testimony on whether the line had actually been attached prior to starting drilling. Even Dial testified that no representative of Inexco had been at the well site when whatever testing of the safety systems actually performed was carried out. Smith testified that he had noticed that the kill line was not hooked up and had wondered about it, since this was unusual. The undisputed proof of the haphazard manner in which Inexco pursued its safety responsibilities at this well leaves no doubt in the Court's mind that this kill line was never attached prior to drilling, and the Court so finds as a fact.

The need for the kill line was especially present in this particular oil field, since it was a high pressure area and contained poisonous gas, that is, the oil and the gas at the bottom of the well were under extreme pressure, and therefore was seeking relief by coming up the well bore. This is readily apparent by the fact the well had been "kicking" for some days previous to the accident, or as the roughnecks put it, the well was "trying to come in." In order to control this upward pressure by the petroleum product in the ground the crew had been mixing quite a bit of mud. In this procedure drilling mud is mixed with other chemical additives to be pumped down the well in order that the weight of the mixture might keep the oil and gas down in the well. Whenever the product at the bottom of the well exerts an upward movement on the mass of drilling mud in the well a "kick" takes place. The purpose of the kill line is to control the flow of the well or "kill" the well if it kicks too much and threatens to burst out of control, since on some kicks the drill pipe will clog, in which

event the only way to pump in mud would be through the kill line. If the well were to blow, that is if the upward pressure of the oil and gas were to overcome the weight of the drilling mud, then the blow-out preventers would close and drilling mud would be pumped through the kill line.

The records of the mud program carried out at this well were examined by the expert witness Montgomery, and the quantity of mud used left no doubt in this witness's mind that the well had been kicking prior to the accident. This testimony was confirmed by the testimony of the roughnecks themselves, who all testified that the well had been kicking prior to the accident and that they had carried large quantities of mud in an effort to control this pressure.

## DAMAGES

There is no doubt that the plaintiff Nevel Walters suffered a devastating injury as a result of this explosion. He testified that he almost drowned from the mud thrown out by the explosion and that his leg was on top of his shoulder. He was rushed to the Jones County Community Hospital for emergency treatment on the day of the accident, and was confined therein until April 2, 1971. Subsequently, he was in the Jones County Community Hospital from April 8, 1971 through April 10, 1971, from April 19, 1971 until May 3, 1971; from May 12, 1971 through May 15, 1971; and from June 21, 1971 through June 23, 1971. He was hospitalized in the Forrest County General Hospital from August 13, 1971 through September 23, 1971; from September 13, 1972 until September 15, 1972; from January 21, 1973 through February 8, 1973; and from November 26, 1973 until February 8, 1974. Walters entered the University Hospital in Jackson, Mississippi on March 27, 1974, and stayed through April 12, 1974, and he was confined in St. Dominic's Hospital in Jackson, Mississippi from March 11, 1975 until March 15, 1975.

After the original explosion, which the plaintiff described as leaving him "broke all to pieces," Walters remembers being placed in the back seat of a car for the ride to the hospital. He passed out during this ride but vaguely remembers being in the emergency room; his next concrete memory was of leaving the hospital some time later.

The original treatment rendered to the plaintiff was to clean out his wound and pin his shattered femur back together, including a pin in his hip, but this caused so much pain that he was put in a body cast for 60 days. The pictures contained in Exhibit P–18 reflect the condition of the plaintiff's right leg during this period, and the obvious swelling and scarring endorse the narration of suffering that the plaintiff gave. After this cast was removed, Walters walked with crutches, but was plagued by constant drainage, swelling and infection in his right leg. Also during this period he was required to wear a heavy brace on his left leg because of the increased strain on that extremity.

Throughout this period Walters had achieved no meaningful recovery and was in constant physical pain and experienced mental depression. In August, 1971, he entered Forrest General Hospital in Hattiesburg, Mississippi for further treatment of the non-union of his shattered hip, and his hip was again pinned together. Part of the treatment at that time was to insert a plate in his thigh, which remained in for over a year. During this time the plaintiff was kept on a diet of buttermilk and cheese in an effort to combat infection, and he was required to drink a half gallon of buttermilk and eat a pound of cheese every day.

Subsequent to this hospitalization the plaintiff was in and out of the hospital for treatment of his injuries, which evidenced no sign of healing, and March, 1974 his right leg "exploded" and began to spew fluid. Walters was transported by ambulance to the emergency room of the University Medical Center in Jackson, Mississippi where he was treated by Dr. E. Frazier Ward.

The pictures contained in Exhibit P–18(A)–(T) vividly recount the agonizing extent of the plaintiff's injuries and the duration and continuation of the accompanying severe pain. In addition, the x-rays con-

tained in Exhibit P–21 through P–27, when viewed in the light of Dr. Ward's explanation, leave no doubt of the severity of the trauma of the plaintiff's long road to his present state of recovery. The pictures and the testimony of Mr. and Mrs. Walters establish that from the date of the injury until the present time, neither of the plaintiffs has had any of the normal enjoyments of life, and Mr. Walters has been in constant severe physical pain and mental depression from both his injuries and the subsequent loss of a limb.

Walters testified that since the date of the accident, he had not enjoyed himself at all, he can't play with his children since he is completely disabled, and his poor physical condition casts a pall over his entire personality. Prior to the accident he enjoyed hunting and being outdoors, but his injuries have ended this hobby or recreation. His wife has to dress him, and assist him in bathing since he cannot get in and out of the tub by himself. The accident destroyed all personal and sexual enjoyment that he previously normally had with his wife.

The plaintiff Mrs. Delphia Walters, who at the time of the trial was 51 years old, testified that she and her husband have two children, one of whom is 7 years old and the other 16. Prior to 1971 her husband was in good physical condition, working constantly and was a good husband and provider.

On the day of the accident she was at home when called and notified of the accident, and she immediately went to the hospital; at first she was not able to see her husband and saw him for the first time when he was being taken to surgery. Mrs. Walters doesn't think her husband remembers much about the first period of hospitalization.

After Mr. Walters was sent home in April, 1971 following the initial operation, Mrs. Walters had to move him around on a stretcher and put him in a car and drive him around to prevent him from having a nervous breakdown. During this period Mr. Walters was in constant pain, and depressed because of the apparent failure of his injuries to improve and his inability to enjoy life. The plaintiff's wounds drained constantly, requiring frequent bandage changes, and omitted a foul odor. At times Mrs. Walters even dragged her husband from room to room in the house on a quilt to try to keep him from "going crazy" as a result of his pain and depression. The constant one surgery after another over the period of years has caused Mrs. Walters untold anxiety and mental anguish, and the strain of the whole experience has been almost more than she could, bear. Her whole relationship with her husband, both personal and sexual, has been completely destroyed, and the accident has had an extremely unfortunate effect upon her husband's personality.

As noted above, the plaintiff was taken to Dr. E. Frazier Ward, an orthopedic surgeon in Jackson, Mississippi, on March 27, 1974, after being transported to the University of Mississippi Medical Center by ambulance. Dr. Ward described the general condition of the plaintiff on that date, and had no doubt that the conditions he observed were a result of the oil rig accident. The doctor found the plaintiff's right thigh severely infected and swollen, a three inch shortening of the right leg, a non-union of the original fracture in the right hip and observed the plaintiff to be in considerable pain. Mr. Walters' right thigh from his knee to his crotch was tender with evidence of multiple operations, and his left knee was also swollen and obviously in very painful condition.

Dr. Ward immediately hospitalized the plaintiff and began to run tests and take x-rays, which revealed multiple screw holes in the right leg, a considerable amount of bone death, the failure of union of the pelvis, and in every detail substantiated the plaintiff's history of his injury. The left pelvis showed signs of having been used to provide a bone graft, which was described by Dr. Ward as an exceptionally painful operation.

According to Dr. Ward, the treatment was complicated by the fact that the plaintiff was 45 years old, had a history of 11 recent operations and pronounced shorten-

ing of the right leg. He discussed these factors with the plaintiff and recommended amputation of the right leg as the best treatment, and on April 2, 1974 Dr. Ward amputated the leg above the knee, while the plaintiff was under a general anesthesia. The incision revealed a large amount of scar tissue, along with dead bone, and at one point Dr. Ward cut into an abscess which was under such tremendous pressure that he had to step back from the operating table because fluid spurted therefrom. The condition of the plaintiff's right leg after this operation is reflected by pictures comprising Exhibit P–18(Q)–(T).

On August 14, 1974, Mr. Walters was fitted with a permanent artificial leg, which may last anywhere from one to five years. However, if the plaintiff were to gain or lose weight, a new limb would be needed, so in Dr. Ward's opinion several of these limbs were needed.

An elastic brace was constructed for the plaintiff's left knee to decrease the stress caused by the loss of the opposite limb, which he now wears because it adds somewhat to the plaintiff's stability. However, the increased stress on the plaintiff's left knee caused by the loss of his right leg is a source of pain, and is aggravating an arthritic condition in the left knee.

In March, 1975 Walters was admitted to St. Dominic's Hospital in Jackson for treatment of chronic inflammation of his stump and tissue reaction to foreign material, and Dr. Ward performed an operation which corrected these problems, and also at that time repaired the amputation site.

The doctor described the problems the plaintiff had experienced with getting a suitable artificial limb, one which fit comfortably and didn't irritate the skin of the stump area. In addition, the plaintiff had suffered from "phantom limb," a sensation in which an amputee feels his missing limb is still there and feels pain in that area, and often tries to walk as he had before the amputation. Dr. Ward said the treatment employed to combat this pain was having some success, but that the trauma associated with this type of amputation was always more severe when there was a long period between the accident and the amputation.

Each artificial limb required by the plaintiff costs around $1000, and the left knee brace which the plaintiff has to wear will cost more than that.

There is no question in Dr. Ward's mind that all of the plaintiff's difficulties proximately resulted from the February 26, 1971 accident. Dr. Ward was also positive that the plaintiff was totally and permanently disabled from gainful employment, and that Walters will require future medical treatment both for his injuries and the severe mental depression that has resulted therefrom.

At the time of the accident in question, the plaintiff was 41 years old, had a fourth grade education, with a life expectancy of 31.3 years and a work-like expectancy of 22.3 years. He and his wife filed a joint federal income tax return for the years 1969 and 1970, which reflect Nevel Walters' earnings to have been $9,364.40 in 1969, and $9,881.32 in 1970. Since the time of the accident the plaintiff has been unable to perform any work. As outlined above, at the time of the accident Mr. Walters was working as an oil rig roughneck, and had been working in the oil fields approximately 26 years, this being the only type of work that Mr. Walters is familiar with.

■ A preponderance of the evidence established that the defendant, Inexco, had the duty to exercise reasonable care to provide a reasonably safe place for Nevel Walters to work on this drilling rig, and that this duty involved providing reasonable and adequate safety devices on this drilling rig, and to properly install and test them when it was safe to do so. Most importantly, from the standpoint of this case, Inexco had the duty to install and test the kill line and to see that it was operational prior to the commencement of drilling. The evidence shows that the kill line was an essential safety feature of a drilling rig, especially in a high pressure area such as this oil field. There is no question that the kill line was not in place immediately prior to the acci-

dent, and this Court finds from the evidence in this regard and its assessment of the credibility of the witnesses that the kill line was never attached to the blow out prevention system before or after drilling was started. The failure of Inexco to discharge this duty constituted negligence, and this negligence was the sole proximate cause of the plaintiff's injury.

As stated above, Mr. Walters' injuries have been painful, disabling and permanent. In summary, he suffered multiple fractures, bruises and lacerations, notably a compound fracture of the right femur, a fracture of the pelvis and severe contusions about his pelvic area. He has endured approximately 11 different periods of hospitalization, a severe infection of his right leg, and non-union of the bone, which continued over three years and resulted in a shortening of three inches of the bone, ultimately leading to amputation of the right leg at mid-thigh in April, 1974. The evidence is undisputed that he will continue to require extensive medical treatment in the future with replacement of his prosthesis from time to time. The average life of a prosthesis such as the plaintiff wears is from two to five years and thus will have to be replaced periodically. Mr. Walters has incurred medical expenses in the amount of $47,266.21 to date of trial. The amputation of the right leg has produced additional stress which has aggravated the condition of his left leg to the point that it is necessary that he wear a brace thereon, and the condition of the left leg will progressively worsen in the future. The plaintiff has and will continue to suffer severe pain, completely disabling him from all gainful employment, and making him dependent on others for attention to his daily personal needs. All of these damages are the direct and proximate result of the discussed negligence of the defendant Inexco. The plaintiff Nevel Walters is therefore entitled to recover from the defendant Inexco necessary and reasonable medical expenses incurred to the time of the trial in the sum of $47,266.21. In addition, in light of the undisputed proof that Nevel Walters will require future medical attention, he is entitled to recover from the defendant Inexco a sum to compensate him for future medical expenses in the amount of $10,000.00.

As noted above, the latest complete earnings records for Mr. Walters reflect that he earned $9,881.32 in 1970, and had it not been for the negligence of the defendant Inexco the plaintiff would have been able to continue to work and earn at a minimum this sum. Therefore the plaintiff's loss of earnings from February 26, 1971 to the date of this trial, May 3, 1978, or seven years and two months, has been $70,-816.13, and he is entitled to recover this sum from the defendant Inexco. Furthermore, the plaintiff will suffer future loss of gross earnings during his work life expectancy of 22.3 years from the date of trial in the amount of $220,353.43, which discounted to its present value using a discount rate of 5% yields a figure of $131,034.20.

The plaintiff Nevel Walters has suffered a horrendous amount of severe physical pain and mental anguish from the time of the accident until the date of the trial. This is the direct and proximate result of the negligence of the defendant Inexco, and therefore the plaintiff is entitled to recover from Inexco a reasonable sum to compensate him for these damages in the amount of $75,000.00. Mr. Walters will experience a large amount of physical pain and suffering and mental anguish in the future as a result of this accident. The severity of his injury has already been outlined above, along with the devastating effect it has had both physically and mentally on the plaintiff's life style and outlook on life. The extent and permanency of his injuries are pronounced, and they will prevent him from ever having the enjoyment of life that he had prior to the accident. His ability to function as a husband and father has been severely, if not completely, destroyed, and the injury has resulted in a complete and adverse personality change in Nevel Walters. He will no longer be able to engage in his hobbies and will be severely handicapped in his enjoyment of life hereafter by the loss of his leg. The Court feels that

this element of damage justifies an award of damages in the amount of $200,000.00, in light of the severity and trauma associated with the injury Nevel Walters suffered.

■ Turning to the claim of the plaintiff Mrs. Delphia Walters for loss of consortium, the Court finds that this plaintiff has suffered severe injury in this regard as a result of the injury to her husband. The ordeal Mrs. Walters has undergone because of the injury and the change it has made in their relationship has been outlined above. All of these damages are the result of the negligence of the defendant Inexco, and therefore Mrs. Walters will be entitled to recover an award of $50,000.00 from Inexco for the loss of her husband's companionship, consortium and services.

## Conclusions of Law

The plaintiff Nevel Walters was an employee of Loffland Brothers, an independent contractor performing work and services for Inexco Oil Co., operator of the well being drilled at the time of the injury. By virtue of the hiring of an independent contractor, Inexco Oil Co. has certain duties imposed upon it by law. These duties have been succinctly stated in *Ingalls Shipbuilding Corp. v. McDougald*, 228 So.2d 365 (Miss.1969), wherein it is stated:

> Ordinarily a prime contractor is not liable for the torts of an independent contractor or of the latter's servants committed in the performance of the contracted work. This is based on the theory that the contractee does not possess the power of controlling the person employed as to the details of the work. However, one who employs an independent contractor is nevertheless answerable for his own negligence. So an employer owes a duty to an independent contractor and the latter's employees to turn over to them a reasonably safe place to work or to give warning of danger.

228 So.2d at 367.

*See also, Mississippi Power Company v. Brooks*, 309 So.2d 863 (Miss.1975).

■ In the case *sub judice*, Inexco has clearly violated its duty to provide the employees of Loffland a safe place to work by failing to exercise reasonable care to attach or attach and have tested the kill line prior to the commencement of drilling operations. This failure caused Nevel Walters to be put in the position which caused his injury since because of Inexco's failure in this regard, Walters was trying to hook this kill line while the well was under pressure and in an unsafe condition for this work to be performed. The scenario before the Court would merit different interpretation if the Court were convinced that Inexco had initially fulfilled all of its responsibilities in regard to insuring the integrity of the safety systems at this well site. However the Court has previously found as a fact that Inexco did not do so, and it is the breach of this duty from which Inexco's liability must flow.

In addition, although abstract discussions of the principles of duty are necessary in determining the appropriate body of law to apply to the case under consideration, the nature of the danger involved in the negligence of the employer of the independent contractor is also significant. Unfortunately the search for oil and gas is an extremely dangerous operation with a tremendous potential for injury to the men involved in this occupation, especially to those workmen engaged in the actual drilling operation. The danger posed to the people working on drilling rigs by the nature of the work calls for care to be observed in safety matters. Failure to take adequate precautions can lead to tragic results, as happened in this case.

The duty of Inexco to make sure this kill line was properly attached, tested and in place prior to the commencement of drilling has been established, the Court has found as a matter of fact that this was not done, and since this failure put the plaintiff Nevel Walters in the position of having to make the kill line connection while the drilling rig was under pressure and extremely hazardous, it constituted active negligence which was the sole proximate cause of the plaintiff's being injured.

The plaintiff Mrs. Delphia Walters suffered a substantial loss of "conjugal rights" as a direct proximate result of the injury caused by the negligence of Inexco, and therefore she is entitled to recover compensation therefor. *Tribble v. Gregory*, 288 So.2d 13 (Miss.1974); *Miss.Code Ann.* 93–3–1 (1972).

 The contract between Loffland and Inexco provides that Loffland will:

> Protect, indemnify, and save operator harmless from and against all claims, demands, and causes of action of every kind and character arising in favor of contractor's employees ... resulting from the willful or negligent acts or omissions of contractor and/or contractor's agents, employees, representatives or subcontractors.

As is apparent from the terms of this provision, this is not a commitment by Loffland to stand between Inexco and any loss occasioned by the negligence of Inexco. Rather it is an agreement that Loffland must indemnify Inexco for any loss Inexco might suffer as a result of the negligence of Loffland or others connected with Loffland. Since the Court has found no negligence on the part of any Loffland personnel, the terms of this indemnity provision are not applicable to the facts of this case. The condition which caused the injury was caused by the negligence and neglect of its duty on the part of Inexco. Therefore the third party defendant, Loffland Brothers, is entitled to prevail in the third party action.

### Conclusion

The Court has found that Inexco was negligent in this action, and that Nevel Walters and his wife have suffered damages as the sole proximate result of this negligence. Mr. Walters is entitled to the following sums as damages: (1) medical expenses to the date of trial: $47,266.21; (2) future medical expenses: $10,000.00; (3) loss of earnings to date of trial: $70,816.13; (4) future loss of earnings: $131,034.20; (5) physical pain and mental anguish to date of trial: $75,000.00; (6) future physical pain and mental anguish, nature and extent of injury and effect on future enjoyment of life: $200,000.00, which when totaled entitled him to a Judgment in the amount of $534,116.54 against the defendant Inexco Oil Company. Mrs. Delphia Walters is entitled to a Judgment of $50,000.00 against the defendant Inexco Oil Company.

The plaintiffs will therefore submit Final Judgments to this Court, embodying the decision in this Memorandum Opinion and approved as to form by counsel for all parties, within the time and in the manner provided in the Local Rules of this Court.