228 So.2d 365 (1969)
INGALLS SHIPBUILDING CORPORATION
v.
Neill R. McDOUGALD, Jr.
No. 45477.
Supreme Court of Mississippi.
November 10, 1969.
Morse & Morse, Gulfport, for appellant.
*366 Cumbest, Cumbest & Shaddock, Earl L. Koskela, Pascagoula, for appellee.
ETHRIDGE, Chief Justice:
Neill R. McDougald, Jr., plaintiff-appellee, brought this action in the Circuit Court of Jackson County against Ingalls Shipbuilding Corporation seeking damages for personal injuries received by him when he stepped off a platform on the upper deck of a vessel under repair by Ingalls in its Pascagoula shipyard and fell. The jury returned a $75,000 verdict for plaintiff, and Ingalls has appealed from a judgment based on that verdict.
McDougald was an employee of Coastal Marine Service, Inc., which contracted with Ingalls to render gas free the fuel tanks of a vessel, which had been a troop carrier during World War II and had been acquired by Litton Industries Leasing Corporation from the mothball fleet of the United States Government. It had been towed from Virginia to Pascagoula without power and was tied up in the Pascagoula River, a navigable waterway, in the outfitting docks on the south part of Ingalls' yard. Ingalls had contracted to cut off the bow and the stern of the vessel, refurbish them, and build a new mid-section designed to carry containers. The exterior of the vessel, including the upper deck on which McDougald slipped and fell, was covered with a heavy coat of preservative applied many years ago.
McDougald was night foreman of a Coastal Marine gas-freeing crew. It was necessary first to free the oil tanks of gas before doing other repairs. The accident occurred on the night of April 30, 1965, at approximately 8:25 P.M., aboard this vessel, which was under the custody and control of the prime contractor, Ingalls. McDougald and his crew had relieved the day crew. He assigned his men their jobs of pumping out the oil tanks on the fore and aft sections of the ship and then went to check on the pumps. He had to step upon a platform in order to see below. A string of lights which were hanging over the stern were not burning at the time. When he stepped down from the platform, about thirty inches high, McDougald stepped on a slippery surface, which caused him to fall and slide into debris and scrap on the deck, causing his injuries.
At the time of the fall, Ingalls controlled the vessel. It had assigned safety engineers to make regular inspections of this and other vessels in the shipyard. Ingalls had guards who patrolled the ship twenty-four hours a day. It was Ingalls' duty to maintain the lights on the deck, including the aft section of the vessel. The guards were assigned to make security checks, and, if they found an unsafe condition, they were supposed to bring it to the attention of the safety department or the supervisors. McDougald said that Ingalls had had a "great deal of trouble" with the aft lights and that sometimes they would be off for one to two hours at a time, requiring his work to be shut down until the lights were turned on.
McDougald previously had been on the aft section of the vessel and was generally familiar with its construction. On the night in question, he had in his hand a flashlight, and, before stepping down from the platform, he turned it on the deck, but did not see anything indicating a slippery condition. However, as soon as he stepped on the deck he began sliding and in the process got some sort of greasy or oily substance on his clothes. A crust lay over the slippery material. McDougald's flashlight covered an area of 18-24 inches, but, he said, its illumination was "not nothing like" that of the string of lights above the deck, which was out at the time. A business agent for a labor union, who boarded the ship two or more times a week to make safety inspections, said that the surface of the upper deck was oily and slippery when he was aboard the vessel several weeks after the ship was in dock. The two witnesses for the defendant testified that the preservative *367 on the vessel was very hard. When Ingalls removed it several months later, the preservative had to be taken off by sandblasting.
This is an action by the employee (McDougald) of a subcontractor (Coastal Marine) against the prime contractor (Ingalls). McDougald was an invitee on premises under the control of Ingalls. The question is whether there was sufficient evidence to make a jury issue on Ingalls' failure to exercise reasonable care to keep the premises in a reasonable safe condition for the use of the plaintiff-invitee, i.e., by Ingalls' failure to light the aft deck. We think there was.
When McDougald was injured, the vessel under repair was afloat upon navigable waters; so, the substantive rules of maritime law apply to this action. State courts derive in person admiralty jurisdiction from 28 U.S.C.A. § 1333(1), commonly referred to as the "saving to suitors" clause. Panama R.R. Co. v. Vasquez, 271 U.S. 557, 46 S.Ct. 596, 70 L.Ed. 1085 (1926); Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922); Scudero v. Todd Shipyards Corp., 63 Wash.2d 46, 385 P.2d 551 (1963). But maritime law controls maritime torts, whether suit be brought in an admiralty, or in a common law or state court. In short, the substantive law to be applied here is that which would have been applied had the action been brought in an admiralty court. 2 Am.Jur.2d, Admiralty § 113 (1962). However, since maritime tort law includes the doctrine of comparative negligence, as does the law of this jurisdiction, the final disposition of this action under either body of law will be the same.
Ordinarily a prime contractor is not liable for the torts of an independent contractor or of the latter's servants committed in the performance of the contracted work. This is based on the theory that the contractee does not possess the power of controlling the person employed as to the details of the work. However, one who employs an independent contractor is nevertheless answerable for his own negligence. So an employer owes a duty to an independent contractor and the latter's employees to turn over to them a reasonably safe place to work or to give warning of danger. W. Prosser, The Law of Torts § 80 at 546 (3d ed. 1964); 41 Am.Jur.2d, Independent Contractors §§ 24, 25, 27 (1968); Annot., 31 A.L.R.2d 1375 (1953); 57 C.J.S. Master and Servant § 603 (1948); see generally, Whatley v. Delta Brokerage & Warehouse Co., 248 Miss. 416, 159 So.2d 634 (1964); May v. Vardaman Mfg. Co., 244 Miss. 261, 142 So.2d 18 (1962).
Moreover, this duty to use reasonable care to furnish the employees of a subcontractor a reasonably safe place to work includes that of furnishing light when necessary to make the place where the work is being done reasonably safe. Greenleaf v. Puget Sound Bridge & Dredging Co., 58 Wash.2d 647, 364 P.2d 796 (1961); Crawford v. Duluth Missabe & Iron Range Co., 220 Minn. 225, 230, 19 N.W.2d 384, 388 (1945); Prickett v. Sulzberger & Sons Co., 57 Okl. 567, 157 P. 356 (1916); Bruns v. Northern Iowa Brick & Tile Co., 152 Iowa 61, 130 N.W. 1083 (1911); Annot., 44 A.L.R. 932 (1926). The evidence and reasonable inferences from it were sufficient to justify the jury in finding that Ingalls, in control of the vessel, failed to exercise reasonable care to furnish plaintiff a reasonably safe place to work, by its undisputed failure to have the aft deck of the vessel lighted, and that this negligence was a proximate cause of McDougald's injuries.
Appellant complains of three instructions granted the plaintiff, but when they are read along with all of the instructions given the jury, there was no reversible error in them.
*368 A careful review of the evidence on damages convinces us that the verdict of $75,000 is not supported by the evidence and is grossly excessive. McDougald claims to have suffered two hernias and injury to his left ankle as a result of the fall. He was hospitalized twenty-seven days in May 1965 for surgical repair of a ruptured ligament in the left ankle. Dr. Glass, the treating physician, testifying for the plaintiff through deposition, stated that the result of the surgery was a completely stable ankle with a fifteen percent permanent disability.
McDougald had a history of prior difficulty with this ankle. In June 1964 Dr. Glass had treated McDougald for a twisting of his left foot, ankle, knee, and hip suffered when he slipped on some oil in a barge. The doctor's records reflected that someone else also had treated the plaintiff for an injury to his left foot, which had some bone atrophy. Dr. D.J. Enger, an orthopedist who examined the plaintiff shortly after the accident and applied a short leg-walking cast, observed in a letter introduced into evidence by agreement of the parties, that the plaintiff "has a history of repeated minor injuries to the left ankle."
Following the ankle surgery, the plaintiff went to Dr. J.M. Raines, who also testified for the plaintiff by deposition. Dr. Raines operated on McDougald in July 1965, for a right inguinal hernia, and in September 1966, for a left inguinal hernia. McDougald was hospitalized thirteen days for the first operation, six days for the second. Dr. Raines said that both operations were successful and that the plaintiff had no disability remaining after them.
The jury was justified in finding that the plaintiff's right inguinal hernia resulted from the fall, but Dr. Raines, who on prior occasions had treated the plaintiff for convulsions, testified that the left hernia "must have been the result" of the hiccoughs and extremely severe convulsions to which the plaintiff was susceptible and from which he had suffered for several years. Dr. Glass testified that the plaintiff was a highly nervous individual. For many years he had had stomach ulcers, which had received surgery, and he had undergone a gastric resection. The plaintiff's evidence indicates that the left inguinal hernia resulted from his own somatic infirmities, not from the fall.
McDougald's doctor, hospital and medical bills for all injuries, including the left inguinal hernia, totaled $2,690.79. He suffered considerably from the injury to his left ankle and the right hernia. Owing to the inflammation and swelling associated with the hernia, he lost consortium with his wife. The evidence on loss of wages during the seven months the plaintiff was out of work and on probable future loss of wages shows a substantial loss, but not to the extent claimed. Some of plaintiff's testimony on future lost wages is manifestly exaggerated. Considering the matter realistically and as favorably to plaintiff as reasonably possible, and evaluating his other damages, we conclude that the verdict of $75,000 is not supported by the evidence and is grossly excessive.
Accordingly, the judgment of the circuit court is affirmed on liability, and reversed and remanded for a new trial on damages alone, unless within ten days after the date the judgment of this Court becomes final, appellee enters a remittitur of $15,000, thus reducing the judgment to an aggregate of $60,000, in which event the judgment as amended will be affirmed in toto.
Affirmed on liability and reversed and remanded for a new trial on damages, unless appellee accepts specified remittitur, in which event judgment as amended will be affirmed in toto.
RODGERS, BRADY, PATTERSON and SMITH, JJ., concur.