309 So.2d 863 (1975)
MISSISSIPPI POWER COMPANY
v.
Mrs. Sue BROOKS et al.
No. 47895.
Supreme Court of Mississippi.
February 24, 1975.
Rehearing Denied April 7, 1975.
*864 Eaton, Cottrell, Galloway & Lang, Ben H. Stone, Gulfport, for appellant.
Cumbest & Cumbest, John L. Hunter, Pascagoula, for appellee.
Before RODGERS, SMITH and SUGG, JJ.
SUGG, Justice, for the Court:
This is an appeal from a judgment rendered by the Circuit Court of George County against Mississippi Power Company in the amount of $500,000.
Mrs. Sue Brooks and her four children filed an action against Mississippi Power Company (MPC), five of its employees and one employee of Foster Wheeler Corporation (FWC) for the wrongful death of Billie Brooks, the husband and father of plaintiffs. Liberty Mutual Insurance Company, the Workmen's Compensation carrier for FWC, intervened in the suit for recovery of $2,766 paid by it to the plaintiffs as beneficiaries of Brooks and for all additional sums it might pay such beneficiaries to the date of final judgment. It further prayed that it be given credit for any additional sums recovered by plaintiffs, less reasonable costs of collection, thereby relieving it from further responsibility to the plaintiffs for benefits under the Mississippi Workmen's Compensation law to the full amount of any recovery related to the death of Brooks.
When plaintiffs rested, the court directed a verdict for three of the individual defendants and after all testimony was completed, granted a peremptory instruction for the three remaining individual defendants. The case was submitted to the jury as to the remaining defendant, MPC.
Plaintiffs alleged in their declaration that the place where Brooks died was under the primary control of MPC and that MPC failed to furnish Brooks a safe place to work and failed to warn him of the danger existing there. The declaration also charged that MPC undertook to institute a safety program, but failed to provide a program that adequately protected employees from hazards on the construction site, and that Brooks met his death because of, "either the non-feasance or mis-feasance of the defendant, Mississippi Power Company... ."
MPC denied any negligence on its part, denied it failed to furnish a safe place to work, denied it had control of the boiler area where Brooks' body was found and alleged that FWC had exclusive control of the area. MPC also denied any duty to inspect for safety and denied that it assumed any duty to make inspections.
MPC contracted with FWC to design and construct a boiler to be used in generating unit No. 5 at Plant Jack Watson in Harrison County, Mississippi. The boiler was to be built within the structural steel framework previously erected by MPC. FWC was an independent contractor which agreed to design, construct and install a boiler with full and complete control over the mode and method of the work. FWC was to furnish all materials and labor, make the boiler safe for progress inspections, furnish its own electric power from a delivery point on the ground outside the boiler unit and make full tests of the boiler before its acceptance by MPC. FWC was the only contractor involved in the construction of the boiler and designed and built the entire boiler as a self-contained unit. At the time of the death of Brooks, the boiler had not been tested by FWC and control thereof had not been assumed by MPC.
Billie Brooks was not an employee of MPC but was employed by FWC as a boiler *865 maker. On July 25, 1972, Brooks and a fellow employee, Gary Redd, were working on a part of the boiler located beneath the hoppers. At noon Redd left to eat lunch, but Brooks remained behind. When Redd returned from lunch, he found Brooks' tools, lunch box and thermos bottle where the two had been working that morning, but Brooks was not there. Soon after lunch a search for Brooks was begun, and his body was located at the bottom of a vertical air duct about 4:30 that afternoon.
On the east side of the boiler, there was located a primary gas flue consisting of a vertical and a horizontal duct. The ducts were rectangular in shape and measured four feet by eight feet. The vertical duct was about 50 feet long with a metal damper at the bottom about 35 feet above ground level. The vertical duct extended upward from the damper with the top being 80 to 85 feet above ground level. The body of Brooks was found in the vertical duct lying on the damper, and since the duct was enclosed, it was necessary to cut a hole in the side of the duct through which his body was removed. About 45 feet above the damper, a horizontal duct connected the vertical duct to the hopper area and a large flue adjacent to the hoppers. The horizontal duct was 4 feet wide, eight feet tall and approximately 20 feet long. There were expansion joints on each end of the horizontal duct where it joined the vertical flue and the hopper area. In the hopper area there were five hoppers joined together with each hopper tapering to a small hole at the bottom. The bottom part of each hopper resembled an inverted pyramid. At the point in the hoppers where they began to taper, iron beams about six inches wide, called "walk beams," were installed which extended from one side of the hopper to the other side.
All of the area in the horizontal duct, the vertical duct, the hoppers and flue adjacent thereto was completely enclosed with the exception of two small access holes, one on the side of the hopper near the top and one on the side of the large flue adjoining the hoppers. Both access holes were located on the sides of the hoppers and large flue where the horizontal duct connected with the hoppers. One of the access holes provided permanent access while the other was temporary.
Entry into the horizontal duct from the place where Redd left Brooks at noon could be accomplished only through the access holes previously mentioned. The access hole located near the top of the hoppers was about 2 feet square. In order to enter the horizontal duct through this access hole, one would be required to go up to elevation 105 by means of a stairway or ladder and cross a scaffold to the access hole. Upon entering the access hole, one would then descend a slanting ladder on the interior of the hopper wall to the "walk beam" and walk across the hopper on the beam about 14 feet to the big flue, thence into the horizontal duct.
In order to enter the other access hole, one would descend to a lower level, cross the structural area, ascend to the access hole and enter the large flue. The horizontal duct could then be entered by walking across the bottom of the large flue to the edge of the hopper area.
Brooks could have fallen into the vertical duct only after entering the horizontal duct through one of the two access holes, traversing the length thereof and then stepping over the expansion joints located at both ends of the horizontal duct. Regardless of which access hole he crawled through, once entry had been made, he was inside the flue assembly which was wholly designed and constructed by his employer, FWC. MPC, the employer of the independent contractor, did not design, construct or furnish any part of the boiler or its components. MPC, the owner, furnished to the independent contractor, FWC, only the premises on which the generating plant was being constructed and the structural steel framework within which the boiler and its components were to be installed. *866 There was no allegation or evidence that either the premises or the structural steel framework were unsafe or contributed to the death of Brooks.
The liability of MPC must be determined by its duty to the employees of its independent contractor, FWC. The general rule is that the employer of an independent contractor has no vicarious liability for the torts of the independent contractor or for the torts of the independent contractor's employees in the performance of the contract. In Smith v. Jones, 220 So.2d 829 (Miss. 1969) we held that the negligence of an independent contractor could not be imputed to an owner. We also held that the owner was not liable for injuries sustained by an employee of an independent contractor caused by the negligence of such independent contractor.
However, the owner is liable for his own negligence. This was clearly enunciated in the case of Ingalls Shipbuilding Corporation v. McDougald, 228 So.2d 365 (Miss. 1969) where the Court discussed the obligation of a prime contractor to furnish the employees of a subcontractor a reasonably safe place to work. Ingalls did not involve a contract between an owner of property and an independent contractor but dealt with a contract between a prime contractor and an independent contractor who was a subcontractor; however, the principles set forth apply to a contract between an owner and an independent contractor. In Ingalls we stated:
Ordinarily a prime contractor is not liable for the torts of an independent contractor or of the latter's servants committed in the performance of the contracted work. This is based on the theory that the contractee does not possess the power of controlling the person employed as to the details of the work. However, one who employs an independent contractor is nevertheless answerable for his own negligence. So an employer owes a duty to an independent contractor and the latter's employees to turn over to them a reasonably safe place to work or to give warning of danger. W. Prosser, The Law of Torts § 80 at 546 (3d ed. 1964); 41 Am.Jur.2d, Independent Contractors §§ 24, 25, 27 (1968); Annot., 31 A.L.R.2d 1375 (1953); 57 C.J.S. Master and Servant § 603 (1948); see generally, Whatley v. Delta Brokerage & Warehouse Co., 248 Miss. 416, 159 So.2d 634 (1964); May v. Vardaman Mfg. Co., 244 Miss. 261, 142 So.2d 18 (1962).
Moreover, this duty to use reasonable care to furnish the employees of a subcontractor a reasonably safe place to work includes that of furnishing light when necessary to make the place where the work is being done reasonably safe. Greenleaf v. Puget Sound Bridge & Dredging Co., 58 Wash.2d 647, 364 P.2d 796 (1961); Crawford v. Duluth Missabe & Iron Range Co., 220 Minn. 225, 230, 19 N.W.2d 384, 388 (1945); Prickett v. Sulzberger & Sons Co., 57 Okl. 567, 157 P. 356 (1916); Burns v. Northern Iowa Brick & Tile Co., 152 Iowa 61, 130 N.W. 1083 (1911); Annot., 44 A.L.R. 932 (1926). (228 So.2d at 367).
It has been noted that there was no allegation or evidence in this case that the premises furnished by MPC were unsafe for use by the employees of the independent contractor. The hazardous condition charged was that of an unlighted and unbarricaded duct which was a part of the boiler system constructed solely by FWC, the independent contractor. Some of the facts in this case bear a strong resemblance to Smith, supra, in that MPC contracted for a completed job with FWC and exercised absolutely no control over the details of the work or the acts of the employees of FWC. We hold that MPC was not guilty of negligence for failing to furnish the employees of the independent contractor a safe place to work or to warn of any hazards because the place where Brooks was killed was created by, and brought into existence, by the very nature of the work itself. Since this was done by *867 Brooks' employer, an independent contractor who had full control over the mode and manner of constructing the boiler and its components, MPC had no duty to make the structure actually built by such independent contractor safe for the independent contractor or its employees and had no corresponding duty to warn of any hazard in connection therewith.
It is also contended that MPC gratuitously assumed the duty to make safety inspections of the work to be performed by the independent contractor. There is no evidence which shows that MPC assumed the duty of making safety inspections of the work of FWC, its independent contractor; therefore, the assertion that MPC gratuitously assumed the duty must fail. In view of the fact that MPC was not shown to be guilty of any negligence, the peremptory instruction requested by it should have been granted.
Reversed and rendered.
RODGERS, P.J., and PATTERSON, SMITH, ROBERTSON and WALKER, JJ., concur.