Edward H. RAMSEY, Plaintiff,
Bituminous Fire and Marine Insurance
Company, Intervenor,

v.

GEORGIA–PACIFIC CORPORATION,
Defendant, Third-Party Plaintiff,

v.

WALKER WELDING & MACHINE
COMPANY, INC., Third-Party
Defendant.

Civ. A. No. J77–0068(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

March 24, 1981.

Alvin M. Binder, Bobby B. DeLaughter, Jerome L. Lohrmann, Jackson, Miss., for plaintiff.

Thomas H. Suttle, Jr., Jackson, Miss., for intervenor.

Vardaman S. Dunn, Jackson, Miss., for third party defendant.

William A. Pyle and L. Arnold Pyle, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

The plaintiff, Edward H. Ramsey, a resident citizen of Mississippi, filed this action against the defendant, Georgia-Pacific Corporation, in the Circuit Court of the First Judicial District of Hinds County, Mississippi on February 16, 1977, 5th Cir., 597 F.2d 890 Georgia-Pacific is a Georgia corporation authorized to do business in the state of Mississippi, and on March 4, 1977, removed this case to this Court. The defendant filed its answer on March 29, 1977, and a third-party complaint on April 6, 1977 against Walker Welding & Machine Company, Inc. (Walker Welding), a Mississippi corporation. On August 8, 1977, this Court entered an order allowing the intervention of Bituminous Fire and Marine Insurance Company, the third-party defendant's Workmen's Compensation carrier.

The plaintiff, an employee of Walker Welding, alleges that on May 29, 1976 while he was welding on a conveyor assembly installation for Georgia-Pacific on its premises in Taylorsville, Mississippi, a chain which was attached to the conveyor assembly and held up by a lifting device commonly known as a "cherry picker" which was operated by an employee of the defendant Georgia-Pacific, broke and caused the conveyor assembly to fall on the plaintiff and permanently injure him. Ramsey charges that Georgia-Pacific, by and through its employees in the operation of its equipment, i. e. the cherry picker, in the installation of this conveyor assembly, was negligent because (1) the conveyor assembly was not properly supported to prevent it from falling in the event that there was a breakage or failure of the lifting device; (2) the defendant failed to utilize lifting devices sufficient to lift and sustain the weight of the conveyor assembly preventing its falling on the plaintiff; and (3) that the defendant failed to provide plaintiff a safe place to work. Plaintiff charges that as a direct and proximate result of the above negligent acts and omissions of the defend-

ant, he was seriously and permanently injured, has sustained permanent loss of wage earning capacity, has incurred medical expense in efforts to be cured to the point of maximum medical recovery, has endured intense and excruciating physical and mental pain and will continue to suffer in the future, is permanently prevented by his injuries from performing the duties and responsibilities of a father and husband, and that he has been prevented from engaging in the normal pursuits of life and thus has been damaged in the total sum of one million dollars.

Georgia-Pacific answered the plaintiff's allegations, and during the lengthy time of this proceeding has filed three amendments to its answer in which it has included numerous defenses. Furthermore, the defendant filed a third-party complaint against plaintiff's employer, Walker Welding, and charged that Georgia-Pacific entered into an indemnity agreement under which Walker Welding agreed to protect, defend Georgia-Pacific and indemnify it for any claims, losses, liability, attorneys fees, costs or other expenses for any injury, loss or damage to person or property arising out of Walker's performance and preparation and installation of the reclaimed conveyor or hopper for Georgia-Pacific Corporation at its Taylorsville, Mississippi plant. Walker Welding answered the third-party complaint, and subsequent thereto, during this lengthy litigation, has filed several amendments to include as many as nineteen defenses to the third-party complaint.

On July 25, 1978, the Court pre-tried this case and heard Georgia-Pacific's Motion for Summary Judgment against the plaintiff and Walker Welding's Motion to Dismiss and/or Summary Judgment filed in opposition to Georgia-Pacific's third-party complaint. The Court, subsequent to reading the briefs of the parties and hearing oral arguments, denied Georgia-Pacific's Motion for Summary Judgment and granted Walker Welding's Motion for Summary Judgment as to the third-party complaint. A judgment dismissing the third-party complaint was entered on July 31, 1978. On August 22, 23 and 24, 1978, the Court held a bench trial of the plaintiff's claim against Georgia-Pacific, and took the case under advisement. On this same date, Georgia-Pacific noticed its appeal of this Court's Summary Judgment of its third-party complaint against Walker Welding. On September 22, 1979, while this Court had the plaintiff's case against Georgia-Pacific under advisement, the United States Court of Appeals for the Fifth Circuit reversed and remanded this Court's Judgment of Georgia-Pacific's third-party complaint against Walker Welding.

Shortly after the Fifth Circuit's remand, while this case was still under advisement, the Court met with counsel for all parties to discuss the manner in which the Court should proceed. As a result of that conference, the Court decided to reopen the case and conduct another trial so that the third-party defendant, Walker Welding, could have its day in court. The Court permitted all parties to put on any witnesses and introduce any evidence desired. Also, we allowed both the defendant and the third-party defendant to amend their answers to assert new defenses.

On August 25, 1980, the Court held another pre-trial conference and once again set this matter for trial. A revised pre-trial order was filed on September 8, 1980, and on September 15 and 16, 1980, the case was retried before the Court without a jury. Based upon all the evidence of record, the pre-trial order, pleadings and memoranda of authority submitted by all parties, this Court makes the following Findings of Fact and reaches the following Conclusions of Law.

## FINDINGS OF FACT

### NEGLIGENCE

On April 30, 1976, Georgia-Pacific issued to Walker Welding its "Construction Purchase Order", under the provisions of which Walker Welding was to construct and deliver to the premises of Georgia-Pacific at Taylorsville, Mississippi, a reclaimed conveyor. Subsequent thereto, the reclaimed

conveyor was constructed and was ready to deliver pursuant to the purchase order. Initially, it was the intent of Georgia-Pacific to install the conveyor with its own forces, however, shortly before delivery, A. W. Ogletree, Shop Foreman for Walker Welding who sometimes estimates jobs and bids for Walker Welding, entered into an oral agreement with Georgia-Pacific for the installation of the conveyor. Under this arrangement Walker Welding agreed, for the sum of three thousand dollars, to provide the necessary welding and supervisory services for the job, provided Georgia-Pacific would furnish a crane (cherry picker) and its operator. Walker Welding did not agree to pay Georgia-Pacific for the use of the cherry picker and its operator, a Georgia-Pacific employee.

On Friday, May 28, 1976, the plaintiff, Edward Ramsey, employed as a welder by Walker Welding, began working with the rest of the Walker Welding crew on the installation of the conveyor assembly at the defendant's plant. The Georgia-Pacific foreman, Oliver Parker, assigned Joe Robert McWilliams to operate the defendant's cherry picker on the job site, and no other instructions were given to McWilliams other than to proceed to the site and run the crane. McWilliams, an experienced crane operator for Georgia-Pacific, was normally assigned a job to do without further instructions and supervision.

In preparation for performing his assigned task of operating the crane, McWilliams arranged to borrow some cable from another contractor working at the plant to attach to the crane to make the necessary lifts. McWilliams told Johnny Spights, a Walker Welding employee, where he could find the cable and subsequently, Spights went and obtained it. In the meantime apparently one of Walker Welding's employees other than the plaintiff had attached a chain to the component conveyor pieces to serve as the rigging equipment by which the crane would conduct the lifting and unloading. McWilliams, who testified that he always preferred cable over chain and that he "does not like to lift with chain because a chain breaks quick when it

breaks," told Spights that he would rather not use the chain and that he did not trust it. After some brief deliberation on the matter, however, the chain was used in the unloading of several component pieces of conveyor from the truck.

On the next morning, Saturday, May 29, 1976, the date of plaintiff's injury, the Walker Welding crew, including the plaintiff, resumed its welding, fabrication and installation of the conveyor assembly. Joe McWilliams operated the crane once more, using chain instead of cables, despite the fact that he knew and recognized that cable was available and that it would have been easy for him to have substituted the cable for the chain.

It was undisputed at trial that the only directions given to McWilliams by any of the members of the Walker Welding crew were suggested directions reflecting necessary cooperation such as "up, down, left, or right." There was no Walker Welding supervisor or Georgia-Pacific supervisor on the job. No member of the Walker Welding crew either had authority to or actually did instruct McWilliams on how to operate the crane or in what manner to make the necessary lifts. Oliver Parker, who assigned McWilliams to the job site to operate the crane did not designate a flagman to assist McWilliams and none was furnished by Walker Welding.

As the conveyor was welded and assembled, McWilliams went to one end of the conveyor and lifted it with a single piece of three-eighths inch chain. McWilliams testified at trial that he did not inspect the chain nor did he know its capacity prior to using it. The chain was attached to the conveyor assembly through a small rough edged hole that had been burned out in one of the top angle irons. Several witnesses, including the operator, McWilliams, testified that such a rigging was extremely unsafe. McWilliams admitted that he was not only aware of the chain being used, but that he saw how it was attached through the hole, and as stated above, he recognized such a procedure to be unsafe.

The conveyor was lifted by McWilliams approximately three feet off the ground and Walker Welding's crew worked around it in this position for some eight hours. At approximately 3:30 P.M. the conveyor was raised an additional foot, apparently so the plaintiff or other employees of Walker Welding could get underneath it to do some additional welding. After a short period of only four to five minutes the chain holding the conveyor broke, causing the conveyor to fall on Mr. Ramsey, resulting in his suffering a broken back, ribs, legs, multiple contusions and abrasions, and other serious injuries which resulted in the permanent disability of his lower extremities.

During the trial Joe McWilliams examined the chain (Exhibit G–11) and subsequently testified that he noticed three defective links therein, and that he did not check the chain before the lift, and that Walker Welding employees hooked it up. However, McWilliams testified that had he examined or closely observed the chain before the lift, he would not have attempted to make the lift with it. McWilliams testified further that on the day after the accident, Walker Welding's men welded eyes on each side of the conveyor to enable it to be braced by shoring under it with cross-ties furnished by Georgia-Pacific. Furthermore, McWilliams testified that two and three-quarter inch choker cables were used to make the lift on the following day.

McWilliams testified that had Oliver Parker, Georgia-Pacific's foreman, instructed him to leave the job site he would have done so. McWilliams, a regular employee of Georgia-Pacific who was paying his wages, also testified that he had no formal training in the use of heavy equipment; however, he had some twenty years of experience in operating heavy equipment—bulldozers, cranes and cherry pickers. He also testified, as previously stated, that he had no idea of the capacity or strength of the chain he used to make the lift nor was he familiar with the capacity or tolerance of the Galion 125 (cherry picker) he operated, other than the fact that there were some operating instructions affixed to the cab, one of which was "don't pick up too big a load."

During the trial Dr. Harold Koelling, an expert in the field of metallurgical engineering, testified that the chain was defective and was in a patently observable damaged condition before it broke; that in his opinion the chain in question should never have been used to lift the conveyor even if it had been new at the time; that the maximum working load of such a chain even if new is approximately forty-four hundred pounds and the evidence indicated that the conveyor weighed at least twelve thousand pounds. The testimony of the defendant's expert witness, Lathan Williams, that there was nothing improper or dangerous in making the lift with the chain, is unpersuasive. The Court, as the judge of the credibility of the witnesses, is convinced by the plaintiff's expert, Dr. Harold Koelling.

Irrespective of the fact that the chain in question was owned by Walker Welding and that apparently a Walker Welding employee had attached the chain to the crane, we accept the expert testimony of William E. Tompkins and his supporting documentary evidence (Exhibit P–4) that there is a standard of care generally followed by crane operators, that even if a reasonably prudent crane operator does not have anything to do with the rigging equipment or the manner in which it is attached to the load to be lifted, once the rigging is attached to the hook of the crane, it becomes part and parcel of the lifting operation of which the crane operator is in charge. It then becomes his responsibility, totally and exclusively, to see that the operation is conducted in a safe and prudent manner.

As previously stated, Joe McWilliams testified that on the day following the accident cross-tie timbers were furnished by Georgia-Pacific and were used to brace the conveyor while it was lifted by cable. And as indicated by McWilliams, all of these materials were readily available for use on the day of the accident. McWilliams stated under oath that he would never again make a lift in the manner which he did on the day of the accident.

McWilliams testified that on the day of the accident he left the conveyor hanging in the air by the chain completely unbraced and walked away from it several times for breaks and at noon for lunch. He admitted that his line of vision to the conveyor and the chain was unobstructed. He testified that he knew Mr. Ramsey, the plaintiff, was under the conveyor before it fell because just seconds before the accident someone by the name of Andy told McWilliams something to the effect that "that fellow sure has a lot of confidence in you," to which McWilliams replied "confidence, hell." This statement alone is indicative to the Court that McWilliams knew for a fact that someone was under the conveyor. Furthermore, Lathan Williams, one of Walker Welding's crew, testified that shortly before the conveyor dropped on Ramsey, McWilliams made the statement to him that "that boy sure does have a lot of trust in my operating."

■ Based upon the foregoing findings of fact, it is the opinion of this Court that the following negligent acts of Joe McWilliams directly and proximately caused the plaintiff's serious and painful injuries, suffering and damages, for which the defendant, Georgia-Pacific is liable:

(1) lifting and holding the conveyor assembly when he knew, or in the exercise of reasonable care as a reasonably careful crane operator should have known that the rigging being used by him was unsafe, inadequate or faulty;

(2) failure to know or exercise reasonable care to ascertain the tolerances of his equipment;

(3) failure to support the conveyor assembly with braces while suspended in the air for approximately eight hours;

(4) failure to use a flagman to direct and assist him in lifting and moving the conveyor assembly.

Although the Court has found herein that the negligent acts of the defendant's employee, McWilliams, acting within the scope of his employment, were the proximate cause of plaintiff's injury, we do find based upon the following facts that the plaintiff was contributorily negligent. The plaintiff acknowledged in his testimony before the Court that he was an experienced welder who had for a number of years worked around heavy equipment; that this was not an unusual project for him; and that he was familiar with the weight and structure of the conveyor system under construction in the instant matter. Furthermore, Mr. Ramsey was familiar with appropriate lifting devices to raise the conveyor system and thus as a reasonably careful welder should have exercised reasonable care and caution before crawling under the conveyor system, which he failed to do by going under the conveyor system to weld without at least first shoring up the conveyor.

Under the Mississippi comparative negligence doctrine, the Court is bound to reduce the damages to which he would be entitled by the percentage that his negligence contributed to cause his injuries. We are of the opinion that the plaintiff was twenty-five percent contributorily negligent and thus his damages will be apportioned accordingly.

## DAMAGES

■ We have examined the medical reports and testimony to which both sides have stipulated. It is undisputed that the plaintiff, Edward H. Ramsey, now forty-eight years of age, is paralyzed from the waist down. According to the deposition testimony of Dr. George W. Wharton (Exhibit G–8), Ramsey's paraplegia is total and irrevocable. It is undisputed that he had no significant past illnesses or injuries prior to the accident, and furthermore, he never routinely partook of alcholic beverages or smoked. It is the opinion of Ramsey's physicians that his disability solely and proximately resulted from the conveyor falling on him. The weight of the conveyor obviously crushed and severed his spinal canal, crushed his right elbow, and broke both of his legs, in addition to causing multiple abrasions and contusions.

The plaintiff has undergone a series of four operations. Surgery was first per-

formed on his back. His spinal canal had been severed and had to be literally wired together. A second operation was necessary to rebuild Ramsey's right elbow which had been crushed. The x-rays, which were attached to Exhibit G–8, revealed that the plaintiff's right arm is now held together by two threaded orthopedic screws, and he has only some thirty percent use of his right arm.

The third operation was performed on Mr. Ramsey's broken legs. Although there is no feeling in either leg, Ramsey testified that he could reach and feel the steel plate and screws, which x-rays reveal were implanted in his legs just below the skin surface. A piece of surgical wire from his initial surgery was dislodged in Ramsey's back, requiring a fourth operation to remove the wire which had begun to penetrate the outer layer of skin.

As a result of the plaintiff's paralysis, he is permanently confined to a wheel chair, is impotent and thus unable to engage in sexual intercourse with his wife. Plaintiff has lost all control over his bladder and bowels, and it is necessary that he constantly wear an external catheter and a leg bag. Furthermore, he must regularly take medication to vacate his urinary tract, which is now constantly subject to developing infections and complications. The plaintiff must also take continuous precautions to guard against pressure sores developing on his buttocks as a result of sitting in the wheelchair. Needless to say, in addition to the excruciating physical pain and agony that the plaintiff has and will continue to suffer for the rest of his life, plaintiff has also suffered and will continue to suffer great mental anguish, embarrassment and humiliation.

Testimony at trial indicates that Mr. Ramsey attended school only through the eighth grade, although he did receive a GED, and has always been a manual laborer. His uncontradicted testimony established that at the time of the accident he was earning some $300.00 per week, and if he had not been negligently injured by the defendant Georgia-Pacific he would have been able to continue to work and earn at least that amount. Therefore, the plaintiff's loss of earnings from May 29, 1976 to the date of this trial, September 15, 1980, has been $67,200.00, and he is entitled to recover this sum from the defendant Georgia-Pacific. Furthermore, the plaintiff will suffer future loss of gross earnings during his work life expectancy of 16.4 years from the date of trial in the amount of $255,-840.00, which discounted to its present value using a discount rate at seven percent, amounts to $84,374.94, which he is also entitled to recover.

As previously summarized, Mr. Ramsey's injuries have been painful, disabling and permanent. The evidence is undisputed that he will continue to require extensive medical treatment in the future at a cost of at least $4,000.00 a year. Based upon the testimony, Mr. Ramsey has incurred approximately $44,100.00 in medical expenses to the date of trial, and thus is entitled to recover that amount from Georgia-Pacific. In addition, in light of the undisputed proof that plaintiff will require future medical attention in the amount approximated at $4,000.00 per year, the plaintiff is entitled to recover, based upon a life expectancy of 26.1 years, $104,400.00, which, when discounted to its present value, using a discount rate of seven percent, yields a figure of $17,855.99.

The plaintiff has suffered a horrendous amount of severe physical pain and mental anguish from the time of the accident until the date of this trial as the proximate result of his severe and permanent and disabling injuries, and is entitled to recover therefor a reasonable sum to compensate him for these damages in the amount of $150,000.00. The Court is also of the opinion that the plaintiff will experience a large amount of physical pain and suffering and mental anguish in the future as a result of this accident. The severity of his injury has already been outlined along with the devastating effect it has had both physically and mentally on the plaintiff's life. The extent and permanency of his injuries are pronounced and they will prevent him from ever having

the enjoyment of life that he had prior to his injuries. In light of the severity and trauma associated with this injury to the plaintiff, the Court feels that this element of damage justifies an award of damages in the amount of $300,000.00.

## INDEMNITY AGREEMENT

■ Moving next to the question of the alleged indemnity agreement between the defendant Georgia-Pacific and the third-party defendant, Walker Welding, this Court finds that the so-called hold harmless agreement, i. e. indemnity agreement, was executed on June 1, 1976, the day after plaintiff's injuries. The document was drafted by Georgia-Pacific and was not signed by the parties until after the above accident of May 29, 1976. We are of the opinion that there was no consideration paid by Georgia-Pacific for Walker Welding's entering into this agreement. The evidence is conflicting or in dispute concerning whether Georgia-Pacific and Walker Welding entered into an oral agreement that Walker Welding would indemnify Georgia-Pacific for liability incurred by it resulting from claims or losses as a result of personal injuries or damage arising out of Walker Welding's performance of the work in question; as the trier of fact, we find that no such oral agreement was ever made. This Court credits the testimony of Mr. Ogletree, Walker Welding's shop foreman, that he alone negotiated the installation contract award to assist Georgia-Pacific in installing the conveyor and that there was no agreement for indemnification, oral or otherwise, made by anyone for Walker Welding.

In addition to the testimony of Mr. Ogletree, Billy Walker testified that he left town on Monday, May 24th before the incident on Saturday, May 29th and did not return to Jackson until after Mr. Ramsey was injured. Mr. Walker testified that he did not even know that Walker Welding was going to install the conveyor, but that Ogletree had the authority to make such agreement and did. Finally, Billy Walker testified that before the accident in question he did not discuss or make any oral indemnification agreement with Georgia-Pacific. Walker testified that on Tuesday, June 1, 1976, after the accident of May 29, Mr. Simpson of Georgia-Pacific telephoned him and asked him whether Simpson could send a piece of paper over for Walker's signature to show that Walker Welding had Workmen's Compensation insurance to cover Walker Welding's employees. Mr. Walker testified that he assented and did sign the instrument but did not understand that he was signing an instrument (the written indemnity agreement in evidence) by which Walker Welding assumed the common law liability for injury to the plaintiff or that he was obligating Walker Welding for damages based on common law liability. Walker also testified that he was notified later by Simpson, plant manager of the particle board plant for Georgia-Pacific, that the instrument sent to Walker was not what Simpson had told him that he was sending for Walker's signature.

Based upon the testimony of Billy Walker and A. W. Ogletree, we are of the opinion that there was no oral agreement of indemnification entered into prior to the accident and that the written indemnity agreement executed on June 1, 1976 is invalid.[1] This Court finds that the so-called hold harmless agreement, i. e. indemnity agreement, of June 1, 1976, drafted by Georgia-Pacific *and signed after the fact* is invalid for lack of consideration and was nothing more than a sham on the part of someone acting for Georgia-Pacific.

## CONCLUSIONS OF LAW

### NEGLIGENCE

■ The plaintiff, Edward H. Ramsey, was an employee of Walker Welding, an independent contractor performing the installation of the conveyor for Georgia-Pacific Corporation. By virtue of the hiring

---

1. This Court notes and is impressed by the fact that Georgia-Pacific never called Mr. Simpson or any other Georgia-Pacific employee to contradict the testimony of Ogletree or Billy Walker covering the alleged oral agreement, and no reason was given for such failure.

of an independent contractor, Georgia-Pacific had certain duties imposed upon it by law. These duties have been succinctly stated in *Ingalls Shipbuilding Corporation v. McDougald*, 228 So.2d 365 (Miss.1969) wherein the Mississippi Supreme Court stated:

> Ordinarily a prime contractor is not liable for the torts of an independent contractor or the latter's servants committed in the performance of the contracted work. This is based on the theory that a contractee does not possess the power of controlling the person employed as to the details of the work. However, *one who employs an independent contractor is nevertheless answerable for his own negligence....* (Emphasis added) *Id.* at 367.

*See also Mississippi Power Company v. Brooks*, 309 So.2d 863, 866 (Miss.1975).

In the case *sub judice*, Georgia-Pacific is vicariously liable for the negligent acts committed by its operator, Joe McWilliams, who had a duty to the plaintiff as well as to the other employees of Walker Welding to exercise reasonable care and to operate the crane in the manner of a reasonably prudent crane operator. As previously stated in this Court's Findings of Fact, Joe McWilliams by his acts and omissions clearly breached this duty. His failure to refuse to make or refrain from making the lift because of his knowledge of the insufficiency of the chain, his failure to use the appropriate and reasonably safe rigging, his failure to use supporting braces under the load and his failure to insist upon and utilize a flagman in the operation of this cherry picker resulted in plaintiff's injuries.

As stated in the Findings of Fact, we do find that the negligent acts of the employee of Georgia-Pacific were a proximate contributing cause of the plaintiff's injuries. However, we do not find that these acts and/or omissions were the sole proximate cause of the plaintiff's injuries, but as stated above, the plaintiff was contributorily negligent by placing himself under the conveyor to weld while it was being held up only by the chain connected to the cherry picker. Under the doctrine of comparative negligence in Mississippi the plaintiff's damage award will be reduced by twenty-five percent.

## LOANED SERVANT DOCTRINE

During the trial of this case the defendant Georgia-Pacific took the position that even if its crane operator, Joe McWilliams, a regular employee of the defendant, was negligent, that negligence was imputable to Walker Welding and not to Georgia-Pacific because of the loaned servant doctrine. The defendant cited and argued to the Court the cases of *Brown v. Estess*, 374 So.2d 241 (Miss.1979) and *McCluskey v. Thompson*, 363 So.2d 256 (Miss.1978), in which the Mississippi Supreme Court held that a fellow employee or a corporate officer or agent of a common employer was immune from an action at common law. In these cases the Court adopted the business enterprise concept to hold that common law actions by an injured worker covered by the Mississippi Workmen's Compensation Act can be maintained only against "strangers to the business enterprise" being served at the time of the accident.

In *McCluskey*, the Mississippi Supreme Court said "the purposes and provisions of the act can be fully effectuated by permitting negligence actions, in addition to compensation, only against strangers to the business enterprise...." 363 So.2d at 260. While this Court certainly agrees with the holdings in these cases, we find that Georgia-Pacific's reliance thereon is misplaced. This Court having heard all of the testimony and reviewed all exhibits finds no evidence whatsoever that Georgia-Pacific and Walker Welding entered into a joint venture or business enterprise in the installation of this conveyor. In the instant case the primary legal relationship between Georgia-Pacific and Walker Welding was that of owner and independent contractor. The United States Supreme Court in *Standard Oil Company v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909) held that the primary legal relationship of master and servant continues by legal presump-

tion until there is evidence to the contrary. Here we find no such evidence presented by Georgia-Pacific.

In *Standard Oil* the plaintiff was employed as a longshoreman by a master stevedore, who under contract with the defendant, was engaged in loading oil aboard a ship. All of the work of the loading was done by the plaintiff and his fellow employees of the stevedore, except the operation of a winch which was performed by a winchman in the general employ of the defendant. The plaintiff was injured through the negligence of the winchman, and the sole question to be determined by the Court was whether the winchman was still the employee of the defendant or whether he became the loaned servant of the plaintiff's employer. In holding that he was the employee of the defendant, the Supreme Court said "the winchman was undoubtedly, the general employee of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct or any other reason." 212 U.S. at 225, 29 S.Ct. at 255. The Supreme Court went on to state:

> Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil, but when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be cooperation and coordination, or there will be chaos. *The giving of signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there has been a change of masters.* (Emphasis added). 212 U.S. at 226, 29 S.Ct. at 256.

We find the *Standard Oil* case to be analogous to the instant case.

In considering Georgia-Pacific's argument that Joe McWilliams was a loaned servant of and thus an employee of Walker Welding, this Court finds instructive the Fifth Circuit opinion in *Gaudet v. Exxon Corporation*, 562 F.2d 351 (5th Cir. 1977). In *Gaudet*, as in *Standard Oil v. Anderson, supra,* the defendant argued the loaned servant or borrowed employee doctrine in an attempt to avoid common law liability through the exclusive remedy provisions of the Longshoremen-Harborworkers Compensation Act.[2]

In *Gaudet*, the Fifth Circuit reviewed nine factors, previously discussed in *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969), which should be considered in determining whether an employee is a borrowed employee, i. e., loaned servant of another: (1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation; (2) whose work is being performed; (3) was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate his relationship with the employee; (6) who furnished tools and place for performance; (7) was the new employment over a considerable length of time; (8) who has the right to discharge the employee; and (9) who has the obligation to pay the employee? *Id.* at 355.

█ Just as under the Longshoremen-Harborworkers Compensation Act, an employee in Mississippi who is covered by the Mississippi Workmen's Compensation Act retains the right to sue third parties.[3]

Joe McWilliams, the crane operator in the instant case, testified that he was a full time regular employee of Georgia-Pacific and that he was paid time and a half by Georgia-Pacific for operating the crane on

---

2. The defendant Georgia-Pacific in the instant case is making this exact argument under the Mississippi Workmen's Compensation Act to escape his common law liability.

3. As previously stated, a limitation on this right is the prohibition of suits against co-employees or company officers.

the date of the accident;[4] that Oliver Parker, Georgia-Pacific's employee and his foreman, gave him the general instructions as to what to do, i. e., to run or operate the cherry picker on the job in question; and that the only directions given to him by Walker Welding people were directional in motions, i. e. to go up or down with the crane and not how to operate it. He also testified that if Parker had instructed him to quit operating the cherry picker and leave the job in question at any time, he would have done so.

McWilliams testified that although he preferred not to use a chain to lift he did not refuse to use it or insist on the use of a cable which he considered much safer, because he feared being fired. It is evident to this Court that he was certainly afraid of being discharged by Georgia-Pacific. This conclusion is based on his testimony that Walker Welding could not have fired him, and that if Oliver Parker, his foreman, had come on the job in the middle of the work and ordered him to lower the conveyor and move the cherry picker to another site, he would have done so immediately. The crane operator, Joe McWilliams, throughout this incident was in the employ of the defendant, Georgia-Pacific Corporation and was not a loaned servant.

## JOINT VENTURE

Moving next to the argument of the defendant, Georgia-Pacific, and the third-party defendant, Walker Welding, that the participation of Georgia-Pacific's crane operator in the installation of the conveyor system constituted a joint business venture with Walker Welding, that is, joint participants in a single business enterprise under *McCluskey v. Thompson*, 363 So.2d 256 (Miss.1978), and that plaintiff's claim against Georgia-Pacific is thus barred by the Mississippi Workmen's Compensation Act, this Court finds that this contention is without merit for several reasons.

First, in order to fall within the *McCluskey* rule, plaintiff and McWilliams would

have to be co-employees. For the reasons previously stated, McWilliams was not the loaned servant of Walker Welding, but the employee of Georgia-Pacific and was acting within the course and scope of his employment at the time of Ramsey's injuries. It is undisputed that Mr. Ramsey was working for Walker Welding at all relevant times. For numerous reasons we find that the relationship of Georgia-Pacific and Walker Welding was that of owner and independent contractor at the time of the plaintiff's injuries. Having made this determination, it cannot be said that McWilliams and Ramsey were co-employees. The Mississippi Workmen's Compensation Act defines an employee as follows:

> An employee means any person, including a minor whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, written or oral, express or implied, *provided there shall be excluded therefrom all independent contractors....* (Emphasis added) *Miss.Code Ann.* § 71–3–3(d) (1972).

Our determination that Walker Welding was at all times complained of an independent contractor, is supported by the statutory definition of independent contractor within the meaning of the Act:

> Independent contractor means any individual, firm or corporation who contracts to do a piece of work according to his own methods without being subject to the control of his employer except as to the results of the work and who has the right to employ and direct the outcome of the workmen independent of the employer *and free from any superior authority in the employer to say how the specified work shall be done or what the laborers shall do as the work progresses*; one who undertakes to produce a given result without being in any way controlled as to the methods by which he attains the result. (Emphasis added). *Miss.Code Ann.* § 71–3–3(s) (1972).

---

**4.** It is undisputed that Georgia-Pacific was not to be and never was reimbursed by Walker

Welding for use of the crane or the furnishing of its operator.

A. W. Ogletree, Walker Welding's shop foreman, who handled this particular transaction and project, testified that Walker Welding was contracted by Georgia-Pacific to produce and install for $3,000.00 a finished product in accordance with its own methods without being subject to Georgia-Pacific's control. Georgia-Pacific was merely to furnish Walker Welding with a crane and an operator at its own cost. When questioned by counsel for Georgia-Pacific as to what responsibility Georgia-Pacific had in the installation of this equipment at the plant site, Mr. Ogletree stated "None, they were just to actually reject or accept and pay for or not pay for the contract." Walker Welding was clearly acting at all times complained of as an independent contractor.

Secondly, the factual situation in the case at bar is entirely different from those situations found in *McCluskey, supra,* and the cases cited and relied on therein. Georgia-Pacific and Walker Welding contend that the enterprise liability referred to in *McCluskey* bars any recovery by Ramsey because he and McWilliams were employed by the same enterprise; that only strangers to the enterprise may be liable on third-party claims, and that McWilliams was not a stranger. However, in *McCluskey* as well as each of the cases cited therein, the "enterprise" found to exist was the business employer of the injured employee. In the case *sub judice* the business employer of Ramsey was Walker Welding. In no sense was Georgia-Pacific the business employer or co-employer of Ramsey. As stated, Walker Welding was an independent contractor by whom Ramsey was employed. Georgia-Pacific was the owner of the premises and was under a legal duty to provide independent contractors and their employees a reasonably safe place to work. *Mississippi Power Company v. Brooks,* 309 So.2d 863 (Miss.1975); *Ingalls Shipbuilding Corporation v. McDougald,* 228 So.2d 365 (Miss. 1969).

This Court's holding that the enterprise liability of *McCluskey* applies to the business employer of the injured employee is substantiated not only by the factual circumstances of *McCluskey* but also by the cases cited therein. In *McCluskey* the court said "The Workmen's Compensation Act represents a wide departure from common law because the Act precludes a common law tort action by an employee against *his* employer...." (Emphasis added). 363 So.2d at 256. Furthermore, in *Madison v. Pierce,* 156 Mont. 209, 478 P.2d 860 (1970), a case cited in *McCluskey,* the court stated "There is no reason why negligent strangers *to the business should not pay the cost of injury of the employees of the enterprise.*" (Emphasis added) 363 So.2d at 260. More specifically, however, the Court in *McCluskey* cited *Warner v. Leder,* 234 N.C. 727, 69 S.E.2d 6 (1952), which held that the third-party claim provision of the Act subjects to tort liability "*any other person or party who is a stranger to the employment but whose negligence contributed to the injury.*" (Emphasis added). 363 So.2d at 261.

We find that McWilliams was a stranger to the employment of Ramsey, that is, he was not an employee of the same enterprise or business which employed Ramsey, and thus was not a fellow employee within the meaning of *McCluskey.* The mere fact that McWilliams was operating the crane on the job site does not alter his status as a stranger to Walker Welding, an independent contractor.

This Court is of the opinion that to totally bar an injured employee of an independent contractor performing work on the premises of another from recovering on a third-party claim against that landowner for injuries sustained as a result of negligence on the part of one of such landowner's employees who was not a loaned servant of the independent contractor would totally undermine the purpose, letter and spirit of the Mississippi Workmen's Compensation Act.

## INDEMNITY AGREEMENT

On June 1, 1976, an alleged written agreement was executed by Georgia-Pacific and Walker Welding and contained the following provisions:

It is distinctly understood and agreed between the parties hereto that the CONTRACTOR shall be solely responsible for and shall defend, protect and indemnify PRINCIPAL against any loss or liability occasioned by or resulting from the performance or nonperformance hereby by the CONTRACTOR or anyone directly employed by him, or contracted with, for the making good of defective work, disposal of material wrongfully supplied, making good of damaged property or persons, or excess costs for materials or labor or the CONTRACTOR'S failure to observe proper precautions in the conduct of his work.

Walker Welding and Machine Company, Inc. agrees to protect, defend, and indemnify from any liability Georgia-Pacific Corporation from and against any claims, losses, liability, attorneys fees, costs, or any other expenses for any injury, loss or damage to persons or property arising out of Walker Welding and Machine Company, Inc. performance and preparation of and installation of reclaimed conveyor or hopper for Georgia-Pacific Corporation and includes such contractural liability in Walker Welding and Machine Company, Inc. insurance coverage.

On appeal from this Court's granting of Walker Welding's Motion for Summary Judgment on the Third-Party Complaint, the Court of Appeals agreed with this Court's finding that Georgia-Pacific had no cause of action under this indemnity agreement for any loss due solely to its own negligence, because under Mississippi law a covenant in a construction contract to indemnify another for his own negligence is void and unenforceable. *Miss.Code Ann.* § 31–5–41 (1972). *Crosby v. General Tire and Rubber Company*, 543 F.2d 1128 (5th Cir. 1976). See *Ramsey v. Georgia-Pacific Corporation*, 597 F.2d 890, 892 (5th Cir. 1979). In *Ramsey v. Georgia-Pacific Corporation, supra*, the Fifth Circuit stated "Georgia-Pacific would not be liable to plaintiff for any damages absent some neg-

ligence on its part, since no vicarious liability for acts of an independent contractor exists in Mississippi. *Carr v. Crabtree*, 212 Miss. 656, 55 So.2d 408 (1951)." 597 F.2d at 893.[5]

The Court of Appeals also stated in *Ramsey:*

> ... absent any contractual right Georgia-Pacific would have no right of contribution of indemnification against Walker Welding as a joint tort-feasor under Mississippi law. If both actively contributed to the accident, neither has a common law right of contribution against the other. *Granquist v. Crystal Springs Lumber Co.*, 190 Miss. 572, 1 So.2d 216, 218 (1941). . . . Although Mississippi law permits recovery by a passively negligent wrongdoer against one whose active negligence caused the accident under the theory of implied indemnity, *Home Insurance Co. of New York v. Atlas Tank Manufacturing Co.*, 230 So.2d 549, 551 (Miss.1970), the "passive-active" theory of indemnification is made unavailable to Georgia-Pacific as a passive wrongdoer by the exclusive remedy provisions of the Mississippi Workmen's Compensation Act. . . . as interpreted by the Court in *Smith Petroleum Service, Inc. v. Monsanto Chemical Co.*, 420 F.2d 1103, 1111–1112 (5th Cir. 1970).

597 F.2d at 893.

The Fifth Circuit's basis for reversing the granting of a Summary Judgment was its observation that the indemnity provision of this contract seems to provide that Walker Welding would possibly be required to indemnify Georgia-Pacific for any liability of Georgia-Pacific for damages or possible injuries arising out of Walker Welding's negligence. Apparently, with this interpretation the hold harmless or indemnity agreement would be enforceable under *Miss.Code Ann.*, § 31–5–41 (1972). The Fifth Circuit said

---

**5.** It is quite apparent from the Fifth Circuit having reviewed the facts of this case, based upon the briefs of the parties before it, that Walker Welding was an independent contractor and not a joint venturer with Georgia-Pacific.

We reach the conclusion that summary judgment should not have been granted on this point because (1) the contract seems to contemplate that Walker Welding would be solely responsible for the work so the parties would be protecting Georgia-Pacific against Walker Welding's activity in this regard; (2) Mississippi law does not foreclose such an agreement; (3) were it not for the insulating factor of workmen's compensation, Mississippi law itself would provide for a passive-active wrongdoers shifting of liability. *Home Insurance Co. of New York v. Atlas Manufacturing Co., supra.*

By this decision we do not predict how this litigation will come out. A full hearing may disclose that the agreement cannot be interpreted as we have suggested here. But the apparent lack of Mississippi controlling law and the failure to have a fully developed case before the Court make summary judgment an inappropriate way of handling the issues in this case.

597 F.2d at 894.

In accordance with the Fifth Circuit's opinion, this Court conducted a full trial in which all facts were divulged, including evidence surrounding this alleged indemnity agreement between Georgia-Pacific and Walker Welding. As previously stated, the evidence adduced at this hearing has definitely convinced this Court that the alleged hold harmless or indemnity agreement signed by Billy Walker is invalid for lack of consideration and also is unenforceable and nothing more than a sham.

■ As we stated earlier there was no sufficient consideration to support the agreement which would subject Walker Welding to exposure for indemnification to Georgia-Pacific arising from an injury to Walker Welding's employee, Edward Ramsey. It is undisputed that Walker Welding received nothing in the way of economic consideration in exchange for the hold harmless agreement which was executed on the day following the plaintiff's injuries, and any argument that the award of the installation job was in some way conditioned upon the execution of the agreement is without merit. Under Mississippi law a failure of consideration for an agreement may be shown by parol, extrinsic evidence, dehors the writing. *Broome Construction Co. v. Beaver Lake Recreational Center,* 229 So.2d 545 (Miss.1969); *Meyer v. Casey,* 57 Miss. 615 (1880).

■ In the instant case, the last paragraph of the agreement referring to performance recited no consideration. It is nothing more than a promise to indemnify, *given after the fact.* No price was paid or bargained for in exchange for the promise. Mississippi law specifically states that "a promise without consideration is unenforceable." The Mississippi Supreme Court in *Godchaux Sugars, Inc. v. Fink,* 188 Miss. 531, 195 So. 318 (1940) stated:

A promise is not binding on the promisor unless an agreed price has been paid for or bargained for in exchange for the promise. Volume I, Section 75, Restatement of Contracts; Williston on Contracts, 1938 Edition, Section 100; *Smith v. Cauthen,* 98 Miss. 746, 54 So. 844; *Owen Tire Company v. Bank of Woodland,* 136 Miss. 114, 101 So. 292; *Bancroft v. Martin,* 144 Miss. 384, 109 So. 859, 111 So. 434.

Furthermore, the assumption of an obligation by a corporation as an accommodation, without consideration, is even beyond corporate powers and is said to be ultra vires. *Ketchan v. Mississippi Outdoor Displays,* 203 Miss. 52, 33 So.2d 300 (1948).

Recognizing that the promise exacted from Walker Welding, after the fact, required some consideration, the defendant Georgia-Pacific then attempted to show at trial that Walker Welding, through Mr. Walker, had orally agreed before the accident that he would sign a hold harmless agreement. However, based upon the testimony of Billy Walker and A. W. Ogletree, this Court found that there was no prior oral agreement.

Billy Walker had no clear understanding of what a hold harmless agreement contained. The alleged written agreement, at

best, is vague in content and devoid of the specifics of which binding contracts are generally made, and hence it cannot reasonably be concluded that there was any meaningful meeting of the minds on anything of substance which might significantly alter or affect the pre-existing obligations or immunities of the parties. There is no evidence that the award to Walker Welding of the installation work was conditioned expressly upon an assumption by Walker Welding of liability at common law for injuries sustained by its own employees, and there is no believable evidence from which such a drastic condition may be inferred. The immunity of Walker Welding beyond its obligation for Workmen's Compensation payments is fixed under Mississippi law. It is a right of high value, and is not to be denied upon vague and unspecific promises such as those asserted in this case.

Moreover, the Court reiterates the fact that Mr. Wes Simpson, employee of Georgia-Pacific, who was supposed to have made the oral agreement with Billy Walker prior to the beginning of the work, was never called as a witness by Georgia-Pacific and, indeed, there was no other testimony by any representative of Georgia-Pacific which rebutted the testimony of A. W. Ogletree and Billy Walker denying any such agreement. Therefore, this Court concludes that there was no prior oral agreement by Walker Welding to hold harmless Georgia-Pacific from claims by Walker Welding's employees injured on the job.

Assuming *arguendo*, that this agreement is valid, we are still of the firm opinion that it imposes no liability on Walker Welding for several reasons.

First, we have found that the proximate cause of the injuries of the plaintiff was the negligence of Joe McWilliams, an employee of Georgia-Pacific.

Second, assuming the agreement valid, a fair construction of the agreement would still require that it be applied prospectively to the period beginning June 1, 1976, as typed on the first page of the agreement, and not retroactively to include work prior thereto. As so construed, the work being done at the time of the accident on May 29, 1976 would be excluded from indemnity.

Thirdly, assuming the agreement valid and applicable, since it is a public policy of Mississippi to afford complete common law immunity to employers for injuries to employees who are entitled to receive Workmen's Compensation benefits, that immunity cannot be withdrawn by an ambiguous covenant which does not unmistakably include such employees by reference. In this case, the testimony of Billy Walker was that he did not understand from his conversation with Wes Simpson after the accident that he was being asked to give up immunity from common law claims. Mr. Simpson was not called to refute or challenge Walker's testimony. The agreement relied upon to destroy the immunity refers expressly only to injuries to "persons or property", without mention of "employees" covered by Workmen's Compensation insurance. A fair construction serves to exclude such unmentioned employees, who, under the law, belong to a special class of potential claimants.

For the above reasons, this Court concludes that Walker Welding is entitled to a judgment on Georgia-Pacific's third-party complaint.

## CONCLUSION

This Court has found that Joe McWilliams, the crane operator employee of Georgia-Pacific, was negligent in this action and that the defendant Georgia-Pacific is vicariously liable for the damages that the plaintiff suffered as a proximate result of this negligence. We have also found that there was not a valid indemnity agreement between Georgia-Pacific and Walker Welding and furthermore, that Walker Welding was not guilty of negligence which proximately contributed to plaintiff's injuries. The plaintiff was contributorily negligent in the amount of twenty-five percent. Based upon these Findings and Conclusions the plaintiff is entitled to the following sums as damages: (1) medical expenses to the date of trial in the amount of $44,101.00; (2) future medical expenses in the amount of

$17,855.99; (3) loss of earnings to the date of trial in the amount of $67,200.00; (4) future loss of earnings in the amount of $84,374.94; (5) physical pain and mental anguish to the date of trial in the amount of $150,000.00; and (6) future physical pain and mental anguish, which will affect plaintiff's future enjoyment of life, in the amount of $300,000.00, which when totaled entitles the plaintiff to a judgment in the amount of $663,531.93 against the defendant Georgia-Pacific. This award must however be reduced by the plaintiff's contributory negligence of twenty-five percent, entitling the plaintiff to a total judgment against Georgia-Pacific in the amount of $497,648.95.

For the reasons stated above, Walker Welding is entitled to a judgment dismissing Georgia-Pacific's third-party claim against it.

Finally, the Court notes that under Mississippi law, Bituminous Fire & Marine Insurance Co., the intervenor, is entitled to recover by subrogation the stipulated amount of medical and compensation payments which it has made to the plaintiff.

The plaintiff and third-party defendant will submit Judgments to this Court conforming with this Memorandum Opinion, approved as to form by counsel for all parties, within the time and in the manner prescribed in the Local Rules of this Court.